■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NELSON POLANCO, Appellant. [788 NYS2d 183]—

Carpinello, J. Appeal from a judgment of the County Court of Albany County (Breslin, J.), rendered January 9, 2003, upon a verdict convicting defendant of the crimes of attempted murder in the second degree, kidnapping in the second degree, robbery in the first degree, robbery in the second degree, assault in the first degree, criminal use of a firearm in the first degree and criminal possession of a firearm in the third degree.

Following a jury trial, defendant was convicted of attempted murder in the second degree, kidnapping in the second degree,

robbery in the first and second degrees and assault in the first degree, as well as certain weapons charges, for his role in the abduction, robbery and brutal shooting of a young woman in the City of Albany on the evening of October 25, 2001. He was sentenced to an aggregate prison term of 50 years. On appeal, it is argued that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. Upon our review of the trial evidence, particularly the testimony of the victim and one of defendant's accomplices, Elias Estrella, we disagree.*

Through these two witnesses, the following sequence of events was established. Sometime around noon on the day in question, an individual by the name of Tony Kearney, also known as "Lex," was "jumped" by two unknown young boys. Shortly thereafter, Kearney, Estrella, defendant and Edwin Rosado drove around in search of these "kids." After observing Kearney's two assailants riding in a car with the victim, the foursome drove to a nearby residence, retrieved a gun and went back out in search of them, to no avail.

At approximately 10:00 P.M. that night, Estrella and Kearney approached the victim in a vacant lot while defendant and Rosado waited in a vehicle. Kearney pointed the previously-retrieved gun at the victim and she was forced into the vehicle. They then proceeded to a nearby park where the victim was ordered out of the vehicle and was accused by Kearney of setting him up to be assaulted earlier that day. The victim repeatedly denied any involvement in the earlier incident. Kearney was then content to let the victim go free and she, in fact, began to walk away.

Defendant, however, objected to her release; thus, at defendant's insistence, Kearney again pointed the gun at the victim and directed her back into the vehicle. At this time, defendant repeatedly told the others that the victim "[had] to go," that Kearney "[had] to shoot her" and that, if Kearney was not going to "do it," he would. Defendant also spoke directly to the victim and told her that "she [had] to go." At defendant's request, Kearney passed the gun to him. The victim was again directed out of the vehicle at gunpoint. In response to the victim's inquiry as to why she had to exit the vehicle, defendant remarked that he did not want to "shampoo [its] seats in the morning."

Clinging to Estrella, the victim got out of the car at which

---

* Although Estrella was originally charged with numerous crimes, he pleaded guilty to robbery and agreed to testify against defendant and others.

time Kearney and defendant began yelling at him to "go in her . . . pockets." The victim herself handed over the small amount of cash on her person while Estrella nevertheless went through her pockets. As Estrella pulled away from the victim, who continued to cling to him for protection, defendant shot her in the head. This first bullet immediately blinded her. As she lay on the ground, defendant fired approximately five more shots at her, including one to the chest.

After the men fled and despite her critical injuries, the victim was able to stagger away from the shooting scene where she was ultimately assisted by two bystanders. In the ambulance on route to the hospital, the victim told police that "Lex" (i.e., Kearney) had shot her. Even though she knew this was not accurate, she did so because she did not know the name of anyone else involved and believed, ultimately correctly so, that if the police located Kearney then they would also locate the others, including defendant. As a result of the barrage of bullets fired at her by defendant, the victim suffered from, among other injuries, shoulder, jaw and skull fractures, a collapsed lung and permanent blindness.

Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to support each of defendant's convictions (*see People v Contes*, 60 NY2d 620, 621 [1983]). Likewise, viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we conclude that the verdict was not against the weight of the evidence (*see People v Bleakley*, 69 NY2d 490, 495 [1987]). In support of both contentions, defendant primarily claims that the victim's testimony was unworthy of belief as a matter of law because she initially named Kearney as the shooter. Defendant relatedly argues that Estrella's testimony was equally unworthy of belief because he was protecting Kearney, who was a friend, and was getting a "great deal" for his cooperation (*see* n, *supra*). Indeed, defendant postures that Kearney was in fact the shooter that night, and the contrary testimony of the victim and Estrella was a coordinated fabrication. We have reviewed these witnesses' testimony, including the victim's explanation as to why she did not initially name defendant as the shooter, and are unable to conclude that such testimony was incredible as a matter of law (*see People v Teicher*, 52 NY2d 638, 649 [1981]; *see also People v Morey*, 304 AD2d 855, 856 [2003], *lv denied* 100 NY2d 564 [2003]; *People v Young*, 296 AD2d 588, 592 [2002], *lv denied* 99 NY2d 541 [2002]).

Defendant claims that County Court's imposition of consecutive sentences for the attempted murder and kidnapping counts

was unduly harsh and thus asks this Court to reduce his sentence in the interest of justice. This we will not do. Defendant spearheaded the most frightening and heinous aspects of the victim's horrifying experience that night. He senselessly, callously and violently shot at her multiple times with every intention to kill her. Before doing so, he informed the victim in no uncertain terms that he was going to kill her and insured that any cash on her person was removed beforehand. He has taken no responsibility for his crimes nor has he shown any remorse for his cruelty and utter disregard for the sanctity of human life. In these circumstances, and despite his young age and lack of a criminal record (*see People v Townsley*, 240 AD2d 955, 959 [1997], *lv denied* 90 NY2d 943 [1997]), we find no abuse of discretion nor any extraordinary circumstances warranting modification of any aspect of the sentence imposed (*see e.g. People v Perkins*, 5 AD3d 801, 804 [2004]; *People v Jeanty*, 268 AD2d 675 [2000], *lv denied* 94 NY2d 949 [2000]; *People v Owens [O.V.] [V.O.]*, 256 AD2d 1220, 1223 [1998], *lvs denied* 93 NY2d 877, 880 [1999]).

Cardona, P.J., Mercure, Peters and Spain, JJ., concur. Ordered that the judgment is affirmed.